IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

LORI A. BARKER,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    Case No.
                                   )    11-3416-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lori Barker seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to give controlling

weight to plaintiff's treating physician, Paul Glynn, D.O., and her treating surgeon, Darin

Talley, M.D. I find that the substantial evidence in the record as a whole supports the ALJ's

finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will

be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On August 20, 2008, plaintiff applied for disability benefits alleging that she had been

disabled since October 17, 2007.[1]  Plaintiff's disability stems from anxiety, diabetes, eye

problems, high cholesterol and wrist pain. Plaintiff's application was denied on December 9,

2008. On July 27, 2010, a hearing was held before an Administrative Law Judge. On

November 24, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the

Act. On August 26, 2011, the Appeals Council denied plaintiff's request for review.

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1]During the hearing plaintiff's attorney indicated that her onset date had been amended to
August 28, 2008 (Tr. at 36-37).

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert George Horne, in addition to documentary evidence admitted at the hearing and before the Appeals Council.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earnings the following income from the following employers from 1994 through 2009:

1994
|  347.70 | Ramey Super Markets |
| $ 347.70 | 1994 Total |

1995
| 65.89 | Mr. Gattis Pizza |
| 522.26 | King Soopers |
| $ 588.15 | 1995 Total |

1996
| 609.75 | Breezz, Inc. |
| $ 609.75 | 1996 Total |

1997
| 596.75 | Fiocchi of America, Inc. |
| 151.40 | EBG Health Care IV, Inc. |
| 2,728.89 | Breezz, Inc. |
| 91.44 | Apex Marketing, Inc. |
| 145.75 | Zacson Corporation |
| $ 3,714.23 | 1997 Total |

1998
| 1,373.40 | Sampson Enterprises, Inc. |
| 6,370.44 | Chaffee Nursing Center |
| 107.25 | Otwo III, Inc. |
| 175.28 | James River Carecentre, Inc. |
| 3,149.26 | Breezz, Inc. |
| 67.36 | Name Brands, Inc. |
| $ 11,242.99 | 1998 Total |

4

<u>1999</u>
| | |
|---|---|
| 7,067.00 | Sampson Enterprises, Inc. |
| <u>20.60</u> | Chaffee Nursing Center |
| **$7,087.60** | 1999 Total |

<u>2000</u>
| | |
|---|---|
| <u>8,803.50</u> | Sampson Enterprises, Inc. |
| **$ 8,803.50** | 2000 Total |

<u>2001</u>
| | |
|---|---|
| 2,366.00 | Sampson Enterprises, Inc. |
| 1,392.45 | RH Montgomery Properties, Inc. |
| 4,987.50 | Bennett Street Laundromat |
| <u>3,210.16</u> | Vogue Cleaners, Inc. |
| **$ 11,956.11** | 2001 Total |

<u>2002</u>
| | |
|---|---|
| 14,855.20 | RH Montgomery Properties, Inc. |
| <u>41.20</u> | Healthcare Services of the Ozarks, Inc. |
| **$ 14,896.40** | 2002 Total |

<u>2003</u>
| | |
|---|---|
| 1,162.00 | TLC Early Education |
| 28.00 | In Home Health Care, Inc. |
| 3,089.90 | Judith Anderson |
| 660.47 | Nixa Residential, LLC |
| <u>3,986.75</u> | Spring Ridge Residential, LLC |
| **$ 8,927.12** | 2003 Total |

<u>2004</u>
| | |
|---|---|
| 137.81 | Goochy Goo Daycare Center |
| <u>1,206.40</u> | EBG Health Care IV, Inc. |
| **$ 1,344.21** | 2004 Total |

<u>2005</u>
| | |
|---|---|
| <u>137.81</u> | Dezia D. Lilly |
| **$ 137.81** | 2005 Total |

<u>2006</u>
| | |
|---|---|
| **$ 0.00** | |

<u>2007</u>
| | |
|---|---|
| **$ 0.00** | |

5

2008
       $ 0.00

2009
       $ 0.00

(Tr. at 183-193).

**Function Report - Adult**

In a Function Report dated October 28, 2008, plaintiff described her typical day as follows: On the mornings she is able to get up on her own, she gets up and gets her daughter ready for school. She does a little house cleaning, watches television, waits for her daughter to get home, helps her with homework, fixes supper, plays, takes a bath, and goes to bed (Tr. at 233). Plaintiff is able to feed her daughter, do laundry, help her take a bath, and help her get ready for school (Tr. at 234). Due to low blood sugar, plaintiff is unable to dress, bathe, take care of her hair, shave, feed herself, or use the toilet without assistance (Tr. at 234). She is able to prepare her own meals daily for "one to one and half hours if not longer" (Tr. at 235). She can wash, dry and fold laundry, she can do dishes, she can vacuum and she can dust (Tr. at 235). She only dusts, vacuums and does laundry once a week (Tr. at 235). Her boy friend helps her with chores when her wrist hurts (Tr. at 235). Plaintiff goes outside once a day for about 15 minutes "to the mailbox and back" (Tr. at 236). She can ride in a car but she cannot drive because her blood sugar drops too low and she cannot see well (Tr. at 236). She is able to shop in stores for household things, clothing, and items for her daughter (Tr. at 236). She shops once every two weeks, and it takes all day (Tr. at 236). She is able to use a checkbook, count change, and handle a bank account (Tr. at 236). She has a hard time concentrating on things for very long (Tr. at 237). She colors with her daughter (Tr. at 237).

Plaintiff's impairments affect her ability to lift, reach, talk, see, complete tasks, concentrate, understand, follow instructions and use her hands (Tr. at 238). Her impairments

6

do not affect her ability to squat, bend, stand, walk, sit, kneel, hear, climb stairs, remember, or get along with others (Tr. at 238). She can walk 25 to 30 minutes at a time, then she needs to rest for 5 or 10 minutes (Tr. at 238). She can pay attention for 15 to 20 minutes (Tr. at 238).

**Letter from Brad Stevens**

Plaintiff's significant other, Brad Stevens, wrote a letter to whom it may concern, dated July 23, 2010 (Tr. at 285). The two had been together 6 1/2 years. He has observed her condition deteriorate; she cannot use her right hand to prepare food and do everyday housework such as peeling potatoes. She drops dishes. Minor household chores take all day because she can only be on her feet for short periods of time. She needs to stop and rest often throughout the day. She should not be alone throughout the day because of her fluctuating blood sugars.

**B.      SUMMARY OF MEDICAL RECORDS**

Between October 17, 2007, and April 22, 2008, plaintiff saw Paul Glynn, D.O., at Sparta Health Clinic on approximately ten occasions during which she primarily complained of wrist pain, diabetes, and anxiety (Tr. 295-299). Although some of the treatment notes are illegible, plaintiff's primary diagnoses included polyarthropathy (disease of multiple joints), hyperlipidemia (high cholesterol), diabetes (high blood sugar), and anxiety (Tr. at 299).

On May 19, 2008, plaintiff saw Darin Talley, M.D., at St. John's Clinic with complaints of bilateral wrist pain (Tr. at 320-321). Plaintiff reported that she exercised "daily by walking" and that she smoked a half pack of cigarettes per day and had for the past ten years. Plaintiff was taking only medication for diabetes. Dr. Talley observed that plaintiff was able to make a fist, cross her fingers, and make an "okay" sign without difficulty. Dr. Talley gave plaintiff a brace for her thumb and recommended ice and anti-inflammatory medication.

7

On May 22, 2008, plaintiff saw Dr. Glynn due to a cyst and indicted that she needed an insulin pin (Tr. at 294). She reported that she had gone to Dr. Talley and had been diagnosed with de Quervain's[2] in her thumbs.

On June 19, 2008, plaintiff saw Dr. Glynn for a diabetes follow-up (Tr. at 294). He noted that plaintiff took insulin as needed and that Dr. Talley had treated her wrist with a steroid injection. He wrote, "Hard time with buttons." The record is only a couple lines long, and there is no indication that any exam was performed.

On July 7, 2008, plaintiff followed up with Dr. Talley at St. John's Clinic regarding her right wrist pain (Tr. at 319). Dr. Talley noted that plaintiff was well nourished and in no apparent distress. Plaintiff received a steroid injection in her wrist.

On July 23, 2008, plaintiff saw Dr. Glynn for anxiety and diabetes (Tr. at 293). At that time, she reported that she was doing well with her diabetes and believed it was under control. "Needs pain and anxiety meds. Getting shots in wrists then going for surgery. Has De Quervain's dz." Plaintiff's exam was normal except her wrists were tender when pressed lightly. Dr. Glynn assessed insulin dependent diabetes mellitus, anxiety, and bilateral wrist pain. He prescribed a glucagon[3] emergency rescue kit to use as needed for diabetes, Alprazolam for anxiety, and Oxycodone (narcotic) for pain.

On August 20, 2008, plaintiff filed her application for disability benefits.

On August 28, 2008 -- plaintiff's amended onset date -- plaintiff saw Dr. Glynn for anxiety and diabetes (Tr. at 292). Plaintiff reported that her blood sugars had been out of control for the past two months. Dr. Glynn adjusted her medication dosage.

---

[2]Inflammation of a tendon attached to the thumb.

[3]Glucagon raises blood sugar.

8

On September 5, 2008, plaintiff saw Leo T. Neu, III, M.D., at Mattax Neu Prater Eye Center for a diabetic eye-screening examination (Tr. at 308-309). A retinopathy[4] screening on her right and left eye showed mild non-proliferative[5] changes. Her vision was 20/30 in her right eye and 20/25 in her left eye. Dr. Neu recommended a reevaluation in one year and gave plaintiff a prescription for eyeglasses.

On September 10, 2008, plaintiff saw Dr. Talley at St. John's Clinic with complaints of right wrist pain (Tr. at 315-316). Dr. Talley noted that plaintiff had had two injections in the past that helped for "some period of time." Plaintiff reported some numbness in her thumb and occasional decreased range of motion. She denied having any trauma or weakness. Her right wrist was tender. She could make a fist, cross her fingers, and make an "okay" sign without difficulty. Plaintiff was taking only Humalog (insulin) and Lantus (long-acting insulin). Dr. Talley thought plaintiff would benefit from surgery and she agreed.

Plaintiff had tenosynovectomy surgery (excision or resection of a tendon sheath) on her right wrist sometime between September 10, 2008, and January 7, 2009 (Tr. at 316, 360). The records of the surgery are not in the file, but Dr. Talley's records refer to the surgery as having been done.

---

[4]Diabetic retinopathy is a complication of diabetes that affects the eyes. It is caused by damage to the blood vessels of the light-sensitive tissue at the back of the eye (retina). At first, diabetic retinopathy may cause no symptoms or only mild vision problems. Eventually, however, diabetic retinopathy can result in blindness. Diabetic retinopathy can develop in anyone who has type 1 diabetes or type 2 diabetes. The longer you have diabetes, and the less controlled your blood sugar is, the more likely you are to develop diabetic retinopathy.

[5]Mild Nonproliferative Retinopathy is the earliest stage of Diabetic Retinopathy. It is characterized by the presence of "dot" and "blotch" hemorrhages and "microanuerysms" in the Retina during your eye examination. Microanuerysms are areas of balloon like swelling of the tiny blood vessels in the Retina caused by the weakening of their structure. Mild Nonproliferative Retinopathy can be present without any change in your vision. Mild Nonproliferative Retinopathy usually does not require treatment. http://www.center-for-sight.com/diabetic-retinopathy/diabetic-retinopathy-stages.html

On December 8, 2008, Lester Bland, Psy.D., a state agency non-examining clinical psychologist, reviewed the records and completed a Psychiatric Review Technique form (Tr. at 322-332). Dr. Bland found that plaintiff's anxiety was not a "severe" impairment.

On December 9, 2008, Van Kinsey, D.O., a state agency non-examining medical consultant, reviewed the medical records and found that plaintiff had a primary diagnosis of de Quervain's, a secondary diagnosis of diabetes mellitus type I, and retinopathy (Tr. at 333-338). Dr. Kinsey found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand and walk for a total of about six hours in an eight-hour work day; had no limitation in her ability to push or pull; could occasionally climb ramps, stairs, ladders, ropes or scaffolds; could occasionally crawl and finger (perform fine manipulation) in both hands; had no visual or communicative limitations; and should avoid concentrated exposure to vibration or hazards (machinery, heights, etc.).

On January 7, 2009, plaintiff had a follow up with Dr. Talley at St. John's Clinic after her surgery for de Quervain's (Tr. at 360). Plaintiff reported that her pain was "slightly better" but she was still having "some discomfort." Dr. Tally recommended that plaintiff continue icing her thumb and taking anti-inflammatory medication.

On January 16, 2009, plaintiff saw Dr. Glynn for wrist pain and diabetes (Tr. at 367). Dr. Glynn prescribed an additional blood sugar medication.

Plaintiff returned to see Dr. Glynn on February 20, 2009, reporting that the increased medication did not work -- she had a reaction to it, and Dr. Glynn noted that plaintiff cannot use pork insulin (Tr. at 367). Plaintiff also reported chest discomfort, and Dr. Glynn referred her to Dr. Keesag Baron.

On February 25, 2009, plaintiff saw Dr. Talley at St. John's Clinic for de Quervain's disease (Tr. at 355-356). Dr. Talley noted that he had tried to repair some shredding of the

10

tendon during plaintiff's original surgery, but plaintiff had persistent tendinopathy (injury to the tendon). Dr. Talley noted that plaintiff was not taking any anti-inflammatory medications -- he gave her some samples of Celebrex and told her to return in a month.

On March 10, 2009, plaintiff saw Keesag Baron, M.D., for chest discomfort (Tr. at 346-347). Plaintiff's cardiac risk factors included smoking and diabetes. She was taking only Humalog (insulin), Ibuprofen (non-steroidal anti-inflammatory), and Lantus (long-acting insulin). Dr. Baron recommended a stress test and a lipid panel. "[T]his [is a] diabetic who smokes and she has been informed not to smoke and she needs to exercise regularly."

On March 20, 2009, plaintiff saw Dr. Glynn for wrist pain and diabetes (Tr. at 366). Plaintiff reported having gone to Dr. Baron who recommended a stress test. She said she had been to Dr. Talley about her thumb and he put her on Celebrex. The remaining sentence of this record is illegible.

On March 31, 2009, plaintiff saw Magen Blades, a physician's assistant (Tr. at 344-345). She reported taking only Humalog (insulin), Ibuprofen (non-steroidal anti-inflammatory), and Lantus (long-acting insulin).

On April 2, 2009, plaintiff saw Dr. Talley at St. John's Clinic for de Quervain's (Tr. at 351-352). Dr. Talley recommended an additional injection. He indicated that if the injection failed to provide significant relief, he would refer her to a hand surgeon for a possible tendon reconstruction.

On April 17, 2009, plaintiff saw Dr. Glynn for wrist pain, diabetes, and anxiety (Tr. at 365). She reported still having problems with her right wrist, and she reported having "unstable diabetes." The final sentence in this record is illegible.

On April 30, 3009, Dr. Talley at St. John's Clinic completed a medical source statement form in which he found that plaintiff could lift and carry 20 pounds occasionally and 10

11

pounds frequently; sit, stand, and walk for eight hours each in an eight-hour workday;

occasionally perform handling or fingering; frequently perform reaching or feeling; and

frequently climb, balance, stoop, kneel, crouch or crawl (Tr. at 369-371). Dr. Talley found

that plaintiff had limited ability to push and pull and no environmental restrictions. He found

that plaintiff needed to rest five minutes every hour to alleviate her symptoms; however, he did

not indicate what type of symptoms or what type of "rest," i.e., lying down, not using her

hands, etc. He indicated that if the recommended restrictions were met, plaintiff's

impairments would not disrupt a regular work schedule.

On June 1, 2009, Dr. Glynn completed a medical source statement form in which he

found that plaintiff could lift and carry no more than five pounds; stand and walk for one hour

at a time and for two hours total in an eight-hour workday; sit for one hour continuously and

one hour total in an eight-hour work day; never stoop, kneel, crouch, or crawl; occasionally

climb, balance and reach (Tr. at 374-375). Dr. Glynn stated that plaintiff had limited ability to

push and pull and was limited in seeing due to right macular degeneration. He found that

plaintiff could constantly handle, finger and feel with her "right" hand. It appears that was a

mistake, because the rest of the form indicates that plaintiff has problems with her right hand.

I assume the doctor meant to say she could frequently handle, finger and feel with her "left"

hand only. He found that plaintiff should rest twice per day for a half an hour, would

experience four to five disruptions per month, and would need to rest for the remainder of the

day after a disruption.

On August 4, 2009, plaintiff saw Maryann Mugo, M.D., at Skaggs Diabetes and

Endocrinology Care (Tr. at 410-412). During that visit, plaintiff admitted symptoms of

hypoglycemia (low blood sugar), but denied symptoms of retinopathy (see footnote 1),

neuropathy,[6] nephropathy (disease of the kidneys), and diabetic foot.[7] Plaintiff indicated she exercised by walking daily. She continued to smoke. She denied chest pain. When asked if she was experiencing any pain "now" plaintiff said "no." Plaintiff indicated she was taking Lantus (insulin), Humalog (insulin), nitroglycerin (for chest pain), ibuprofen (non-steroidal anti-inflammatory), Alprazolam (for anxiety) and Oxycodone (narcotic), although it is unclear who prescribed the Oxycodone and when. Plaintiff's psychological exam was normal. Her blood sugar was 457. Plaintiff was assessed with uncontrolled diabetes and uncontrolled diabetic hypoglycemia. Dr. Mugo recommended an insulin pump.[8]

On September 18, 2009, plaintiff saw Dr. Mugo for a follow up (Tr. at 403-405). During that visit, plaintiff reported feeling "much better" and denied symptoms of hypoglycemia, retinopathy, neuropathy, and nephropathy. She reported walking daily for exercise. On plaintiff's pain assessment, she reported that she had no pain that day or the two weeks prior to her visit. Plaintiff's physical exam (including her feet) and psychological exams were normal. Her blood sugar was 135. Dr. Mugo again recommended an insulin pump and told plaintiff to return in six weeks.

------

[6]Diabetic neuropathy is any of several clinical types of peripheral neuropathy (sensory, motor, autonomic, and mixed) occurring with diabetes mellitus; the most common is a chronic, symmetrical sensory polyneuropathy affecting first the nerves of the lower limbs and often affecting autonomic nerves.

[7]A foot with a constellation of pathologic changes affecting the lower extremity in diabetics, often leading to amputation and/or death due to complications; the common initial lesion leading to amputation is a nonhealing skin ulcer, induced by regional pressure, pathogenically linked to sensory neuropathy, ischemia, infection.

[8]An insulin pump is an insulin-delivering device that's used by some people with diabetes. A small battery-operated device that can be worn on a belt or put in a pocket, it's connected to a narrow plastic tube that's inserted just under the skin and taped in place. People who use the pump program it to deliver insulin continuously throughout the day and to release extra doses of insulin to handle rises in blood sugar (after eating, for example).

On September 22, 2009, plaintiff saw Victoria Kubik, M.D., at St. John's Orthopedic Specialists (Tr. at 418-419). "She is on disability and does not do a whole lot at home with the exception of some cooking and sewing." Dr. Kubik noted that plaintiff's mental exam was normal. She recommended additional surgery to repair plaintiff's right wrist tendon. Plaintiff told Dr. Kubik that she would schedule this surgical procedure.

Between May 2009 and June 2010, plaintiff saw Dr. Glynn on approximately 20 occasions during which she complained of wrist pain, diabetes, and anxiety (Tr. at 386-394, 429-433). Dr. Glynn's very brief records contain only plaintiff's complaints and Dr. Glynn's assessments.

On June 1, 2009, plaintiff saw Dr. Glynn and alleged that her blood sugar had been "crazy." She also complained of "bright flashes" and a "wandering of her right eye." Dr. Glynn noted that plaintiff had "appointments coming up" and he gave her medication refills.

On March 28, 2010, Dr. Glynn completed another medical source statement form in which he found that plaintiff had the same restrictions as those listed in his June 1, 2009, statement (Tr. at 396-398).

On April 15, 2010, plaintiff saw Dr. Neu at Mattax Neu Prater Eye Center with complaints of dilated pupils (Tr. at 426). Dr. Neu noted that plaintiff was more than seven months overdue for an eye examination and that she had not brought her glasses with her. Plaintiff reported that her eyes stayed dilated for two days and then went back to normal; she said that she saw flashes and a "blurry blob." This had begun about six months earlier. Her blood sugar had been 128 that morning but she said it "gets high" and that she was still waiting for a pump. Dr. Neu recommended plaintiff return in nine months for a follow-up.

Plaintiff submitted the following records to the Appeals Council after the ALJ rendered his decision. On December 22, 2010, plaintiff saw Joseph Gallegar, a registered nurse at

Skaggs Diabetes and Endocrinology (Tr. at 444-447).  Plaintiff reported problems with food

staying in her stomach and complained of bloating.  Plaintiff admitted to symptoms of

hypoglycemia, neuropathy, and hypoglycemic episodes.  She denied symptoms of retinopathy

and nephropathy.  Plaintiff said she exercised every day by walking, and she continued to

smoke.  "The patient was counseled re: smoking cessation."  Her diabetic foot exam was

normal as was her psychiatric exam.  Nurse Gallegar recommended additional labs and

follow-up in a month.

## C.    SUMMARY OF TESTIMONY

During the July 27, 2010, hearing, plaintiff testified; and George Horne, a vocational

expert, and Dr. Arthur Lorber, a medical expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

Plaintiff and her significant other, Brad Stevens, have lived together for six and a half

years (Tr. at 38).  Plaintiff finished 10th grade and was always in special classes where they try

to help the students learn and understand things better (Tr. at 50).  She does not drive because

of her fluctuating blood sugar (Tr. at 50).  She last renewed her driver's license in July 1999

and it expired in July 2009 (Tr. at 67-68).  She is too scared to drive because she may be

driving when her body decides to digest food and she may kill herself or someone else (Tr. at

50-51).  Plaintiff's attorney asked her if her vision problems was another reason she was not

driving, and she said, "yes" (Tr. at 51).  Plaintiff was not wearing glasses at the hearing; she

has a prescription but cannot afford to buy frames (Tr. at 51).

Plaintiff's boy friend got laid off shortly before the hearing (Tr. at 51).  The ALJ asked

her how she affords to buy cigarettes, and plaintiff said her boy friend buys cigarettes and

gives them to her (Tr. at 51).  She was asked if the boy friend could not instead give her money

15

for glasses frames, and plaintiff said, "Probably, yeah. I never thought of it that way, but yeah." (Tr. at 51-52).

On a typical day, plaintiff does the dishes, but that takes a while because her hand cramps up and curves in and she loses function of her hand (Tr. at 52). If she stands for very long, her feet burn and get very red and swollen (Tr. at 52). A couple times when she has swept the floor, her body curved in on the right side and she had to sit down due to her leg stiffening and her arm (Tr. at 52). Plaintiff lies down to rest three to four times a day for 45 minutes to an hour each time (Tr. at 52-53). She naps when she lies down, and she also sleeps at night (Tr. at 53).

Plaintiff has problems using her hand because she has de Quervain's disease (Tr. at 41). She had surgery, but her hand stays swollen (Tr. at 41). When describing how this affects her, she testified as follows:

> My hand -- like my thumb -- just lays like this the majority of the time. And I have problems grasping things, being able to hold things. You know, to cut up things whenever I -- I'll have a glass of, you know, tea in my hand and it just drops. I lose function of it. And whenever I'm up, trying to like do dishes, I have to go back and sit down because my hand will -- doesn't allow me to do it. My feet swell up -- get red and tingly, and burn. When I come out of like a diabetic reaction, my leg, for some reason, has started to be able to use -- it drags and curves in, along with my right arm.

(Tr. at 41).

Plaintiff testified that she has experienced these issues "within the past six months, a few different times." (Tr. at 41-42). Plaintiff is scared to let her doctors do any more to her right hand -- "they want to take a tendon and veins and take this out, and reattach it." (Tr. at 45, 48). This has not been scheduled (Tr. at 48).

Plaintiff cannot open a jar (Tr. at 57). She can tie shoes, but fastening buttons is difficult (Tr. at 57). She tries to do it with her left hand and can get it done, but it is confusing and it is hard (Tr. at 57). She cannot lift more than five pounds occasionally with both hands -

16

- "I have -- mainly my right hand, but it's hard for me for some reason to balance it out to carry and lift." (Tr. at 59-60). Plaintiff's right hand gets stiff, goes numb, tingles, and she loses feeling in it (Tr. at 57-58). This happens daily, and it also happens to her feet every day (Tr. at 58). On a scale of 1 to 10 with 10 being "you have to go to the hospital", plaintiff's hand and feet pain -- even with her medication -- is a 10 every day: "And 10 ain't even high enough" (Tr. at 58). Plaintiff's legs swell up, cramp, and burn (Tr. at 58). A month before the hearing, Dr. Glynn referred plaintiff to a neurologist and recommended a nerve conduction test (Tr. at 70). Her appointment is scheduled for February, but she does not know the name of the doctor (Tr. at 70-71).

Plaintiff's right eye rolls down to her bottom eyelid to where she cannot see and she gets bright flashes of light (Tr. at 42). Then she will get a dark blurry spot (Tr. at 42). Her eye doctor said it was third nerve eye damage (Tr. at 42). Plaintiff's problems with her eyesight cause her problems with reading and following directions because she has a hard time focusing (Tr. at 54). She cannot pay attention, read things and understand things (Tr. at 54). When asked to clarify whether she meant she had a hard time understanding or just a hard time reading, plaintiff said she has a hard time seeing and reading the words (Tr. at 54).

Plaintiff has had Type I juvenile diabetes for 30 years (Tr. at 54). It has gotten "extremely worse" in the last five years (Tr. at 55).

When asked about Dr. Glynn dismissing her from his practice for "bad behavior," plaintiff said that was Dr. Mugo:

> That's -- that's because they would not get me my pump, and they would reschedule and -- they asked me to set up an appointment. It was my, I guess, duty to get set up with the lady for my pump. Well, every time I called this Kimberly lady, she was never there. I left message after message after message, and she actually called last -- not this [week], the week before -- asking me now after I dropped Dr. Mugo to set up for the appointment for my pump. And I told her that I was no longer with Dr. Mugo, and was going to a different endocrinologist.

17

(Tr. at 42-43). Plaintiff testified that she "finally" got the pump, but as of the administrative hearing, she was not using it (Tr. at 44). She said "the Kimberly lady" never got it set up for her (Tr. at 44).

Plaintiff gets nervous and scared around other people and that causes difficulty focusing (Tr. at 46). Every day plaintiff gets short of breath and experiences chest pain due to anxiety (Tr. at 59). Plaintiff does not leave the house except to go to the doctor (Tr. at 59). When asked if she goes shopping, plaintiff said, "[W]henever I go, Brad goes with me to help with carrying the groceries, and getting them in and out of the vehicles, and -- yeah, I don't go around people. I just -- I'm too scared to, I guess." (Tr. at 59). A few months ago, Dr. Glynn recommended that plaintiff get counseling for her anxiety issues, but she has not done that because she is scared and nervous (Tr. at 45).

When plaintiff eats, her body does not digest the food (Tr. at 49). She recently got a new medication for that (Tr. at 49). Because plaintiff's food does not digest, she gets low blood sugar (Tr. at 55). When the food does finally digest, her blood sugar unexpectedly goes very high (Tr. at 55). This is a daily issue (Tr. at 56). When her blood sugar gets low, she passes out (Tr. at 56). This happens about once every couple weeks (Tr. at 56). Plaintiff has to use a shot when her sugar gets high and another shot when her sugar gets low -- for a period of time afterward she is unable to function because she is weak and "out of it" for a long period of time (Tr. at 56-57).

Dr. Glynn found that plaintiff could stand and walk for two hours a day and for one hour continuously, but she cannot do that much (Tr. at 59-60). Her tail bone tingles and burns if she stands or walks for too long (Tr. at 60). Dr. Glynn found that plaintiff can sit for one hour continuously, but she said one hour is longer than she can sit (Tr. at 60). She gets numb and gets burning pain and has to put her legs up or lie down on her side (Tr. at 60).

Plaintiff's Lyrica causes her to be wobbly and unsteady on her feet (Tr. at 53). Xanax[9] calms her and helps her relax but sometimes it puts her to sleep (Tr. at 53). The narcotic she takes for pain makes her sick to her stomach (Tr. at 53). When she takes all her medication together, it makes her uneasy and tired (Tr. at 53).

The ALJ asked plaintiff why she spent time incarcerated (Tr. at 46). "Bad checks, I think -- and that was a long time -- I mean, it was a warrant for a back check for -- years ago." She testified that it was in 2005 (Tr. at 46). Plaintiff got a deferred sentence and her record was cleaned off; therefore, the ALJ indicated he would not consider that (Tr. at 46).

Plaintiff had a variety of jobs before she stopped working in 2005 (Tr. at 61). When asked why she had so many jobs, plaintiff said, "It got to where I was in charge of taking care of, you know, 25 residential people, and I couldn't do it on my own anymore. I couldn't -- I wasn't able to lift." (Tr. at 61). She was asked if any of her problems at work were related to her anxiety, and she said, "Yes. Nervous and scared about making sure I was doing it right, and being able to understand whenever a resident would come to me, what they were really needing." (Tr. at 61-62). Plaintiff fell and broke her ankle at work due to a diabetic reaction (Tr. at 62). She also missed a lot of work because she had low blood sugar reactions in her sleep and was unable to get up and go to work (Tr. at 62).

2. **Medical expert testimony.**[10]

Medical expert Dr. Arthur Lorber testified at the request of the Administrative Law Judge. Dr. Lorber is a board certified orthopedic surgeon (Tr. at 66).

---

[9]Also known as Alprazolam.

[10]It would be helpful, when transcripts of administrative hearings are made, if a transcriptionist with some knowledge of medical terms could be used -- many of the words marked "inaudible" in this transcript are important medical terms and without those terms, the testimony is rendered much less useful.

Plaintiff has been diagnosed with de Quervain's disease on her right hand (Tr. at 72).

There are certain muscles in the forearm that turn into tendons, and the tendons attach to bones in the area of the carpus, the wrist, and in the fingers. And they go through certain canals, . . . or tunnels, and they can be irritated with frequent and constant motion. And one of those conditions is called de Quervain's, after the . . . physician who first identified the disease. And it is the -- a very simple disease to alleviate. The tendons run right under the skin, just proximal to the thumb, and the surgery actually can be performed under local [anesthesia], if necessary. It is not a technically difficult procedure. Usually, we just open up the soft tissue around the tendon, and that is sufficient. The surgeon who . . . did the surgery stated that he actually excised the [inaudible] in that area. So it's highly, highly unlikely to reoccur, because the tissue that was binding or irritating the tendon has been removed. At the time . . . that surgeon claimed that there were longitudinal splits in the tendon, and that he repaired them or attempted to repair them by sewing them together with sutures. That again is rather peculiar because there are actually anatomic variants in which the tendons are normally more than one might expect, and would not constitute actual splits or pathology in the tendons. In any case, after that surgery she continued to complain of pain, but I think it would be [inaudible] for her to have another surgery in that area, and I do not accept the diagnosis of recurrent de Quervain's. It seems to be based entirely upon the patient's subjective complaint. So it is my opinion that the claimant does not meet 1.02B, which first of all, would require significant problems with both upper extremities. There was even an allegation of right first carpal/metacarpal joint arthritis. There's nothing to support that; no x-ray of it, no x-rays of the wrist have been taken to demonstrate that. And there's been no specific [inaudible] in that joint. Again, she does not meet or equal 1.02B on the basis of that alleged diagnosis.

(Tr. at 72-74).

Dr. Lorber was asked whether any objective testing had been done to confirm the

diagnosis of peripheral neuropathy (Tr. at 80).

[T]here were no objective tests done, in my opinion. With regard to the issue of de Quervain's, that is a clinical diagnosis. One, of course, could presumably do an MRI and see if there's [inaudible] there, but that is not usually performed for de Quervain's. There have been tests of blood sugar, which demonstrated -- an A1c, I believe -- which demonstrated the condition of those [t]issues. And I believe an ophthalmologist examined the eyes . . . and did not advise surgery to the eyes as is customarily done for certain types of proliferative retinopathy, or for retinal detachment. So by and large, there were some tests done, and there are some tests that have been ordered but not done.

(Tr. at 81).

It is my opinion, as far as the . . . allegation of peripheral neuropathy -- that it seems to be based entirely upon subjective complaints. In order to meet a 11.14 peripheral

20

neuropathy, one has to demonstrate persistent disorganization in two extremities, not just sensory changes, or allegations of sensory changes.

It is my opinion, taken singularly or in combination, that the claimant does not meet or equal any listing, and I would suggest that she could function at a limited range of light work activities, meaning that she could occasionally lift 20 pounds, frequently 10. I put no restrictions on her ability to stand and/or walk or sit. I would suggest that she not perform any ladder climbing or scaffolds. I would suggest that [she] avoid extreme hot or cold atmospheres condition. That would be about -- and I would also suggest no frequent gripping with the right upper extremity. But I would not suggest any other exertional, environmental or manipulative restrictions.

(Tr. at 74-76). The occasional gripping that plaintiff can do includes the following:

[O]ne can grip a steering wheel and then pull it to the left or right. One can grip a handle and pull it toward oneself or push it away. One can grip the handle of a pot or a pan. One can grip a hammer with strength, and then grip the hammer, and then use it.

(Tr. at 76-77).

With regard to plaintiff's diabetes, Dr. Lorber testified as follows:

Regarding listing 9.08 diabetes, she is insulin dependent. Right from the get go, for example, on 16 March 05 she did have [inaudible], but it was because she had run out of medicine. Back on 8 November 08, a diagnosis was made of diabetic retinopathy, not severe, non-proliferative. There is no evidence of severe visual problems because of that. There is also an allegation which would fall more properly, I believe, under 2.04 -- that her third cranial nerve has a palsy. That was made just a few months ago, and it has been intermittent palsy. It is not constant -- where she describes her eye locking up. I am not aware of intermittent cranial nerve palsy involving the third cranial nerve, and that would have to be referred to a neurophysiologist, or a neuro-ophthalmologist. That's beyond my scope. But I can tell [you] that I've never heard of such a thing. But the doctor's saying that it's the nerve -- it's working sometimes, and sometimes not working, which makes no sense to me.

(Tr. at 74-75).

Dr. Lorber was asked about the appropriateness of plaintiff's medications (Tr. at 77-78). With respect to Lyrica, he testified as follows:

Well, they're giving her Lyrica . . . perhaps for her peripheral neuropathy. But they have just recently referred her to a neurologist to have a nerve conduction test. So the answer to that question would be best confirmed or denied by the results of that test, which they have not yet performed. The fact -- mere fact that they prescribed a

21

medication based upon her subjective complaints does not establish that she in fact has the diagnosis, and that the use of that medication is proper.

(Tr. at 78).

As to plaintiff's other medications, Dr. Lorber testified as follows:

[T]he Xanax, of course, is for her anxiety. Hydrocodone is for subjective complaints of pain. Celexa is for depression. Ibuprofen is a non-steroidal anti-inflammatory. And she's not taking it in large quantities -- it's not going to hurt her. It's not -- and it may not be helping her. Let's -- Zyrtec is not an issue here. Her other medications are for the treatment of her diabetes, and they're certainly appropriate.

(Tr. at 78).

### 3. Vocational expert testimony.

Vocational expert George Horne testified at the request of the Administrative Law Judge. The first hypothetical involved a person who can perform light work, can only occasionally grip with her right upper extremity, cannot work an unprotected heights or in temperatures of cold, heat, or high humidity, at the SVP[11] level of 6 through 9 she would have a marked limitation in the ability to make judgments on complex work related decisions (Tr. at 85). The vocational expert testified that such a person could perform plaintiff's past relevant work as a telephone solicitor (Tr. at 86). The person could also work as a counter clerk, with at least 2,000 in the state of Missouri and 100,000 in the country, or a furniture rental clerk with at least 1,000 in Missouri and 50,000 in the nation (Tr. at 87).

The second hypothetical incorporated the findings of Dr. Talley's physician's assistant (Tr. at 369-371), i.e., that the person could lift 10 pounds frequently and 20 pounds occasionally; stand or walk for 8 hours per day; sit for 8 hours per day; could frequently climb, balance, stoop, kneel, crouch, crawl, reach, and feel; could occasionally handle and finger; has

---

[11]Specific Vocational Preparation. An SVP of 6 means that it would be expected to take over one year and up to two years to learn the techniques, acquire the information, and develop the facility needed for average performance.

no environmental restrictions; would need to rest for five minutes every hour; would not miss work due to her impairments if these restrictions are met; and has no psychological impairments (Tr. 88-89). The vocational expert testified that because of the need for a five-minute break every hour, the person could not work (Tr. at 89). Without the need for the hourly five-minute break, the person could do the same jobs as in the first hypothetical (Tr. at 89-90).

The third hypothetical incorporated the findings of Dr. Glynn (Tr. at 373-375), i.e., that the person could lift no more than 5 pounds; stand or walk for an hour at a time and for a total of 2 hours per day; sit for 1 hour at a time and 1 hour total each day; had a limited ability to push and pull. The person could occasionally climb, balance, and reach; could never stoop, kneel, crouch, or crawl; could never handle, finger and feel with her right[12] hand; was limited in her ability to see; would be restricted in her ability to work around heights, machinery, temperature extremes, dust, fumes, humidity and vibration; would need to rest at least two times per day for a half hour each time; and would be likely to miss 4 to 5 days of work per month due to her impairments (Tr. at 90-91). The vocational expert testified that such a person could not work (Tr. at 91).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge James Francis Gillet entered his opinion on November 24, 2010 (Tr. at 15-26). Plaintiff's last insured date was March 31, 2009 (Tr. at 15, 17).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 17).

---

[12]The form actually says the person could frequently handle, finger and feel with "right" hand only. However, it appears that was a mistake, because the rest of the form indicates that plaintiff has problems with her right hand. I assume the doctor meant to say she could frequently handle, finger and feel with her "left" hand only.

Case 6:11-cv-03416-REL   Document 21   Filed 02/04/13   Page 23 of 32

Step two.  Plaintiff has the following severe impairments:  insulin dependent diabetes mellitus with right upper extremity neuropathy and polyarthropathy, non-proliferative retinopathy, nicotine abuse, diabetic hypoglycemia, hyperlipidemia, anxiety, and de Quervain's tenosynovitis syndrome status post release (Tr. at 17).  The ALJ found that plaintiff's main problems are uncontrolled diabetes mellitus and pain status post a de Quervain's release (Tr. at 18).  He found that plaintiff's chronic obstructive pulmonary disease is not a severe impairment (Tr. at 18).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 19).

Step four.  Plaintiff has the residual functional capacity to perform light work except she can frequently lift or carry 10 pounds and occasionally lift or carry 20 pounds; stand and/or walk for two hours per workday; sit for six hours per workday; should only occasionally perform manipulative gripping with her right upper extremity; should avoid any exposure to unprotected heights; should avoid any exposure to temperature extremes of cold, heat or humidity; and she has marked limitations in making judgments on complex work-related decisions (Tr. at 21).  With this residual functional capacity, plaintiff is capable of performing her past relevant work as a telephone solicitor (Tr. at 24).

Step five.  Alternatively, the ALJ found that plaintiff can perform the jobs of counter clerk or furniture rental clerk, both available in significant numbers in the national economy (Tr. at 26).

## VI.  OPINIONS OF TREATING PHYSICIANS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of Dr. Glynn and Dr. Talley and instead relied on three non-examining medical consultants: Lester Bland, Psy.D.; Van Kinsey, D.O.; and Arthur Lorber, M.D.

24

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Plaintiff argues that the ALJ "summarizes the findings of Dr. Glynn, but then never actually states what weight is given to the findings of Dr. Glynn or why they are presumably discounted." It is obvious that the ALJ completely discounted the opinion of Dr. Glynn in the medical source statement -- he basically found that plaintiff has to lie down all day, because according to him she can only sit, stand and walk for a total of three hours all day. Since there are five additional hours in a workday, there really is nothing left but lying down or reclining.

Regardless of whether the ALJ specifically stated that he was discounting the opinion of Dr. Glynn, the substantial evidence in the record justifies giving no weight to this opinion. Considering the factors listed in 20 C.F.R. § 404.1527(d)(2) - (5), I find that the ALJ properly chose not to rely on the medical source statements completed by Dr. Glynn.

The length of Dr. Glynn's treatment relationship with plaintiff was several years and she had fairly frequent exams. However, the nature and extent of the treatment relationship is not entirely clear, as plaintiff saw an endocrinologist for her diabetes, she saw an eye specialist for her eyes, she saw a cardiologist for chest discomfort, and she saw Dr. Talley for her wrist

Case 6:11-cv-03416-REL   Document 21   Filed 02/04/13   Page 25 of 32

pain. She did not see a mental health professional and Dr. Glynn did occasionally prescribe Alprazolam for anxiety; therefore, it appears that he mainly treated her for that and perhaps for diabetes in addition to the treatment she received from the endocrinologist.

Clearly the "supportability by medical signs and laboratory findings" factor supports the ALJ's decision. Dr. Glynn's medical records contain nothing but plaintiff's allegations and his assessments. There were never exams done except on one occasion in September 2009, and on that occasion her exam was normal except wrist tenderness. There were no observations recorded, no tests were performed, no x-rays or any other films were ever taken or reviewed. If those things were done, he failed to make note of them in any medical records.

The consistency of Dr. Glynn's opinion with the record as a whole is another problem -- there is no allegation in any medical record of a difficulty sitting, standing or walking. In fact, in a Function Report completed by plaintiff the end of October 2008, she indicated that her impairments do not affect her ability to sit, stand or walk -- wholly inconsistent with the findings of Dr. Glynn.

Finally, with regard to specialization of the doctor, I note that Dr. Glynn is a primary care physician and not a specialist.

The ALJ properly gave no weight to the opinion of Dr. Glynn.

Before assessing plaintiff's residual functional capacity, the ALJ considered the medical source statements of Dr. Talley[13] and Dr. Glynn, but found that the disabling limitations indicated in their forms were inconsistent with other substantial evidence, including the medical opinions of Dr. Lorber, Dr. Kinsey, and Dr. Bland. "The ALJ is charged with the

---

[13]The medical source statement was actually completed by Dr. Talley's physician's assistant; however, I will consider it the opinion of Dr. Talley.

Case 6:11-cv-03416-REL   Document 21   Filed 02/04/13   Page 26 of 32

responsibility of resolving conflicts among medical opinions." <u>Finch v. Astrue</u>, 547 F.3d 933, 936 (8th Cir. 2008).

In December 2008, Dr. Kinsey, a state agency non-examining medical consultant, reviewed plaintiff's records and found that plaintiff had a primary diagnosis of de Quervain's, a secondary diagnosis of diabetes mellitus type I, and retinopathy. Dr. Kinsey found that plaintiff could perform the exertional requirements of light work (i.e., lifting no more than 20 pounds occasionally and 10 pounds frequently and standing/walking off and on for a total of about six hours per day) with limitations in pushing and pulling, occasional postural limitations, occasional limitations in fingering, and a few environmental limitations.

On April 30, 3009, Dr. Talley completed a medical source statement in which he found that plaintiff could perform light work with no limitations in sitting, standing, or walking. Dr. Talley found that plaintiff had no significant postural, environmental, or manipulative limitations. He indicated that plaintiff was limited in pushing and pulling and needed to rest for five minutes every hour.

One month later, on June 1, 2009, Dr. Glynn completed a statement in which he found that plaintiff was substantially more limited than indicated by Dr. Talley. Dr. Glynn found that plaintiff could not even perform sedentary work because she could not lift or carry more than five pounds. Dr. Glynn also stated that plaintiff could only stand and walk for two hours and sit for one hour in an eight-hour workday. He found that plaintiff was limited in seeing due to right macular degeneration; that she was limited in pushing and pulling; and that she could never stoop, kneel, couch, or crawl. He found that plaintiff would experience four to five disruptions per month, after which she would need to rest for the remainder of the day. Dr. Glynn completed another medical source statement on March 28, 2010, indicating that plaintiff had the same limitations as those listed the year before.

At the hearing, Dr. Lorber testified that in his opinion, plaintiff could function at a "limited range of light work activities" by lifting 20 pounds occasionally and 10 pounds frequently. He found that she had no restrictions on her ability to stand and/or walk or sit but that she should not climb any ladders or scaffolds. He found that plaintiff should avoid extreme hot or cold atmospheres and that she could only occasionally use her right hand to grip.

Although plaintiff argues that the ALJ should have given controlling weight to her two treating physicians -- Dr. Talley and Dr. Glynn -- she does not reconcile the fact that those two doctors provided vastly different opinions of her abilities. For example, Dr. Talley found that plaintiff could stand, walk, and sit each for eight hours a day while Dr. Glynn found that she could only do those activities for a combined total of three hours per day. Similarly, Dr. Talley found that plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally, but Dr. Glynn indicated that she could never lift and carry more than 5 pounds. Given the differing opinions of plaintiff's own treating physicians, the ALJ was charged with resolving the conflicts based on the record as a whole. Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("Where there are two inconsistent reports, with one supporting the ALJ's determination, this court must affirm the ALJ's denial of benefits.").

Plaintiff also argues that the ALJ should not have given significant weight to Dr. Lorber's testimony. However, an ALJ may request and consider the opinion of a medical expert in evaluating a claim of disability. 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2). I also note that the ALJ did not accept all of Dr. Lorber's opinion when determining plaintiff's residual functional capacity; rather, he properly determined plaintiff's residual functional capacity after considering all of the opinion evidence, including the conflicting opinions of Dr. Glynn and Dr. Talley, the opinions of the state agency physicians, and the testimony of Dr. Lorber. Estes v.

28

Barnhart, 275 F. 3d 722, 725 (8th Cir. 2002) (it is the ALJ's duty to resolve conflicts among the various treating and examining physicians).

The vocational expert testified that a person with the restrictions as listed by Dr. Talley in his medical source statement could not work only because of the need to stop working every hour for five minutes (Tr. at 89-90). Because the ALJ properly gave no weight to the opinion of Dr. Glynn, and the vocational expert found that a person with the limitations described by Dr. Talley could work, if it were not for the need to take a five-minute break every hour, that is really the most relevant limitation in his opinion. However, to demonstrate the ALJ's careful consideration of all of the evidence, defendant provided a comparison chart which I include, in part, below:

| Function | ALJ | Dr. Lorber | Dr. Kinsey | Dr. Talley | Dr. Glynn |
|----------|-----|-----------|-----------|-----------|-----------|
| Frequently lift | 10 pounds | 10 pounds | 10 pounds | 10 pounds | 5 pounds |
| Occasionally lift | 20 pounds | 20 pounds | 20 pounds | 20 pounds | 5 pounds |
| Stand and/or walk | 2 hours | 8 hours | 6 hours | 8 hours | 1 hour |
| Sit | 6 hours | 8 hours | 6 hours | 8 hours | 1 hour |
| Handling/ fingering | occasionally | occasionally | occasionally | occasionally | frequently with "right" hand (likely a mistake)[14] |

---

[14]If Dr. Glynn actually meant that plaintiff could frequently handle and finger with her "left" hand, he did not specify what she could do with her right hand. The ALJ assumed he meant that she could never perform those functions with her right hand.

| Other | Marked limitations in making judgments on complex work-related decisions | Function at the limited range of light work activities | | Rest 5 minutes every hour | Limited ability to see due to macular degeneration; 4-5 disruptions per month with no work for remainder of the day |
|---|---|---|---|---|---|

Contrary to plaintiff's contention, the ALJ's residual functional capacity assessment was consistent with multiple medical source opinions. Many of the ALJ's restrictions were consistent, if not more restrictive, than the limitations indicated by her treating surgeon, Dr. Talley. For example, the ALJ's lifting restrictions were the same as those found by Dr. Talley, Dr. Lorber, and Dr. Kinsey. Additionally, while both Dr. Talley and Dr. Lorber found that plaintiff could stand, walk, and sit for eight out of eight hours a day, when considering the record as a whole, the ALJ determined that plaintiff could stand and/or walk only two out of eight hours and sit six out of eight hours. The ALJ's residual functional capacity assessment was also consistent with the opinions of Dr. Talley, Dr. Lorber, and Dr. Kinsey with respect to plaintiff's ability to grip with her right hand. Although Dr. Talley provided no environmental restrictions, the ALJ agreed with Dr. Lorber's assessment and found that plaintiff should avoid exposure to unprotected heights and temperature extremes of cold, heat or humidity.

The only restriction placed by Dr. Talley that was not consistent with the ALJ's findings was his comment that plaintiff needed to rest five minutes every hour. The ALJ considered this restriction, but found no support for such a restriction in the record. An ALJ may consider the degree to which a medical opinion is consistent with the record as a whole. See 20 C.F.R. §§ 404.1527 and 416.927. In addition, Dr. Talley did not provide any explanation for this

restriction, and he did not state whether plaintiff would need a break from work completely or whether only her hand required rest five minutes every hour. The more a medical source presents relevant evidence to support an opinion and the better an explanation a source provides for an opinion, the more weight the opinion will receive. See 20 C.F.R. §§ 404.1527(d)(3) and 416.927(d)(3).

Considering that Dr. Talley's resting restriction was not supported by the other evidence in the record, not explained on the form, and not consistent with the doctor's otherwise less restrictive residual functional capacity assessment, the ALJ concluded that Dr. Talley relied quite heavily on plaintiff's subjective complaints, which the ALJ properly found not credible.[15] Dr. Lorber testified that plaintiff's diagnosis of recurrent de Quervain's syndrome seemed to be based "entirely upon the patient's subjective complaint." With regard to peripheral neuropathy, Dr. Lorber testified that any such finding would be "based entirely upon subjective complaints" because no objective tests were done. Similarly, Dr. Lorber stated that although blood sugar tests confirmed plaintiff's diagnosis of diabetes, she did not need surgery for retinopathy or retinal detachment.

The ALJ determined plaintiff's residual functional capacity based on the record as a whole, including plaintiff's subjective complaints, the objective medical evidence, and the various medical opinions evidence. Because the substantial evidence in the record supports his residual functional capacity assessment, his findings must be affirmed.

VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

_____

[15]Plaintiff does not challenge the ALJ's credibility conclusion.

31

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 4, 2013